CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

AUG 24 2022

JULIA C. DUDLEY, CLERK
BY:  s/ H. MCDONALD
    DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Danville Division

| | | |
|---|---|---|
| GLADYS C.,[1] | ) | |
| Plaintiff, | ) | Civil Action No. 4:21-cv-000013 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| KILOLO KIJAKAZI, | ) | By:   Joel C. Hoppe |
| Acting Commissioner of Social Security, | ) | United States Magistrate Judge |
| Defendant.[2] | ) | |

Plaintiff Gladys C. asks this Court to review the Acting Commissioner of Social

Security's ("Commissioner") final decision denying her applications for disability insurance

benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 401–434, 1381–1383f. The case is before me by referral under 28

U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' filings, and the

applicable law, I find that the Commissioner's decision is supported by substantial evidence.

Accordingly, I respectfully recommend that the presiding District Judge affirm the decision.

### I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see

also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] Acting Commissioner Kijakazi is hereby substituted as the named defendant in this action. *See* 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *accord* 20 C.F.R. §§ 404.1505(a), 416.905(a).[3] Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence,

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

2

whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Gladys applied for DIB in December 2016, Administrative Record ("R.") 312–18, and for SSI in January 2017, R. 319–24. She alleged disability beginning on May 1, 2016, R. 312, 319, because of sarcoidosis, diabetes, and asthma, R. 346. Gladys was fifty years old, or a "person closely approaching advanced age" under the regulations, in May 2016. R. 91; 20 C.F.R. §§ 404.1563(d), 416.963(d). Disability Determination Services ("DDS"), the state agency, denied her claims initially in February 2017, R. 90–99, and upon reconsideration that May, R. 100–23. In March 2019, Gladys appeared with counsel and testified at an administrative hearing before ALJ Mark Baker. *See* R. 65–89. On April 17, 2019, ALJ Baker issued an unfavorable decision, finding that Gladys was "not disabled" from May 1, 2016, through the date of his decision. *See* R. 127–39. In February 2020, the Appeals Council vacated ALJ Baker's decision and remanded Gladys's case to another ALJ to consider new medical evidence. R. 149–50.

In July 2020, Gladys appeared with counsel and testified at an administrative hearing before ALJ H. Munday. *See* R. 42–63. A vocational expert ("VE") also testified at this hearing. *See* R. 56–62. ALJ Munday issued a partially favorable decision in August 2020. *See* R. 16–31

(concluding that Gladys was not disabled between May 1, 2016, and July 24, 2019, but that she became disabled on July 25, 2019). ALJ Munday first found that Gladys had not engaged in substantial gainful activity since May 1, 2016, her alleged onset date ("AOD"). R. 18. She then found that from her AOD through July 24, 2019, Gladys had "severe" impairments of sarcoidosis, polyarthritis/osteoarthritis, obesity, asthma, diabetes mellitus, peripheral neuropathy, and left ventricular dysfunction. R. 18. Beginning on July 25, 2019, Gladys continued to suffer from those "severe" impairments, and she had an additional "severe" impairment of sigmoid colon cancer. R. 19. None of Gladys's "severe" impairments met or equaled a relevant Listing. R. 19–21 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.02, 3.02, 3.03, 4.05, 9.00, 11.14, 13.18, 14.09).

ALJ Munday then evaluated Gladys's residual functional capacity ("RFC") and found that, prior to July 25, 2019, Gladys could have performed "light"[4] work, except that she "require[d] a sit/stand option every 30 minutes, if needed, while remaining on task"; could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps/stairs; could never climb ladders/ropes/scaffolds; could frequently finger and operate foot controls; could tolerate occasional exposure to extreme cold and heat, wetness, humidity, pulmonary irritants, and hazardous conditions. R. 21. This RFC ruled out Gladys's return to her past work as a respiratory therapist, both as generally performed in the national economy and as Gladys performed the job. R. 28 ("[M]edium exertional level as generally performed, very heavy exertional level as actually performed."). Before July 25, 2019, however, Gladys could have performed the

---

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b). A person who can meet these relatively modest lifting requirements can perform "[t]he full range of light work" only if he or she can also "stand or walk for up to six hours per workday or sit 'most of the time with some pushing and pulling of arm or leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20 C.F.R. § 404.1567(b)); SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983).

requirements of certain "light" jobs existing in significant numbers the national economy, including marker, garment sorter, and classifier. R. 28 (citing R. 59–62). Thus, ALJ Munday concluded that Gladys was "not disabled" prior to July 25, 2019. R. 30.

ALJ Munday found that, beginning on July 25, 2019, Gladys's RFC was reduced to "sedentary"[5] work with the same non-exertional limitations as above. R. 27. Based on this RFC and Gladys's advancing age, *id.*, she determined that, beginning on July 25, 2019, there were no jobs existing in significant numbers in the national economy that Gladys could have performed, R. 30. *See* 20 C.F.R. pt. 404, subpt. P, app. 2 §§ 201.06, 201.14. Thus, ALJ Munday concluded that Gladys became disabled on July 25, 2019, and continued to be disabled through the date of her decision. *Id*. The Appeals Council declined review, R. 1–6, and this appeal followed.

### III. Discussion

Gladys raises three challenges to the ALJ's decision that she was not disabled between May 1, 2016, and July 24, 2019. First, she asserts that the ALJ made a legally deficient finding at step one of the two-step pain analysis under *Craig v. Chater*, 76 F.3d 585 (4th Cir. 1996) and the Commissioner's regulations. Pl.'s Br. 6–7, ECF No. 16. Gladys also contends that, at step two of the pain analysis, the ALJ failed to offer sufficient reasons for rejecting the alleged severity of her shortness of breath and dyspnea on exertion from pulmonary sarcoidosis and asthma, *id.* at 12–15, and improperly relied on findings of normal gait and strength to discredit the alleged severity of Gladys's lower extremity edema and joint pain, *id.* at 16. Further, Gladys argues that the ALJ erroneously rejected the opinion of her treating rheumatologist, Jayanth Doss, M.D. *Id.* at 8–12. Gladys's arguments are not persuasive.

---

[5] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. . . . Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §§ 404.1567(a), 416.967(a).

A.    *Summary*

1.    *Relevant Medical Evidence*

In late April 2016, Gladys went to the emergency room and was admitted to Trinity Hospital for complaints of shortness of breath, generalized joint pain, and lower extremity swelling. R. 490. A chest X-ray revealed right midlung atelectasis and fullness of the right hilum, R. 493; a CT scan of her chest demonstrated "multiple right hilar and mediastinal nodes/masses concerning for malignancy," *id.*; and a biopsy showed "rare fragments of benign bronchial mucosa with mild chronic inflammation and congestion," R. 525; but was "negative for malignancy," R. 526. A physical exam on May 1 revealed that her breath sounds were "somewhat" diminished throughout the lung fields, R. 2191, and she had generalized puffy edema in her arms and legs, R. 2192. Gladys was assessed with right mediastinal, chest pain and hypoxia, postobstructive pneumonia, diabetes, and asthma. R. 2192. Danial Padgett, M.D., ordered a CT angio scan of her chest and continued her on Toradol, Morphine, and Oxycodone. *Id.* On May 5, it was noted during a diabetes appointment that Gladys experienced dyspnea on exertion and had been prescribed a nebulizer for use three times a day. R. 529–30. Gladys saw Stephen Makoni, M.D., later in May, complaining of increasing shortness of breath for the past two weeks, joint pain, and cough. R. 563. She had recently been started on Prednisone, and she reported that her shortness of breath was improving and she had been able to walk more, although she said she still experienced an occasional dry cough. *Id.* Physical exam results were normal. R. 563–64. Dr. Makoni diagnosed pulmonary sarcoidosis, and he noted that Gladys had mediastinal lymphadenopathy. R. 564.

In June, Gladys established care with DukeHealth. R. 616. She denied shortness of breath, myalgias, and joint pain, and a physical exam revealed normal results, including

symmetrical air intake and normal gait. R. 617–18. In December, Gladys presented to the

Danville Pulmonary Clinic for an evaluation of her sarcoidosis. R. 596. She had slowly been

tapered off Prednisone and her use was discontinued in August, which she said caused

recurrence of her joint stiffness, shortness of breath, chest wall pain, and wheezing. *Id.* Her

medication list included a nebulizer three times a day. *Id*. Physical exam revealed her breath

sounds were "diminished but clear," no edema, and unremarkable extremities. R. 597. William

Henderson, M.D., assessed sarcoidosis and asthma, R. 597, and he advised considering a

program of Methotrexate and Hydroxychloroquine combined with alternate day steroids and

restarted Gladys on Flovent inhaled steroids, R. 598. A myocardial perfusion scan performed

later that month was normal with "[n]o evidence of sarcoid involvement." R. 589.

In January 2017, a pulmonary stress test showed Gladys's oxygen saturation "decreased

from 99% resting to 93% with exercise," and she experienced leg pain that "seem[ed] to interfere

with her exercise" during the test. R. 606. Her DLCO was "slightly decreased," but all other

results were normal. R. 606–07. Gladys saw Dr. Henderson again in February for a sarcoidosis

follow up. *See* R. 603–05. He noted that, at Gladys's last visit, her "pulmonary functions actually

showed preservation of lung volumes which were normal and her DLCO was also normal,"

which "indicated the need not to pursue further steroid therapy." R. 603. Her list of active

medications again noted nebulizer for use three times a day. *Id.* Physical exam showed

edematous nasal mucosa with erythema and diminished breath sounds but was otherwise

unremarkable. R. 604 ("[B]reath sounds are diminished there is really no wheezing reasonably

good airflow."). Dr. Henderson assessed sarcoidosis and polyarthritis, started Gladys on

Meloxicam for her bothersome joint pain and stiffness, continued her on inhaled Flovent

steroids, and noted that "her markers look pretty good with respect to her pulmonary function

and she does not appear at this point [to] have active disease." *Id.*; *see* R. 603 ("[H]er primary complaint has been . . . joint stiffness and pain[.]"). He also recommended physical therapy for her joints. R. 603. At a DukeHealth visit in February, Gladys complained of generalized joint pain worse in her wrists, hands, feet, ankles, and shoulders. R. 619. Physical exam showed antalgic gait and tenderness to palpation in her hands, wrists, knees, and ankles, but findings were otherwise normal with no swelling noted. *Id.* She was referred to rheumatology and ordered to follow up in three months. R. 620.

In March, Gladys presented to the Emergency Department ("ED") at DukeHealth for chest pain. R. 622. She reported gradually worsening chest pain, knee pain, ankle pain, joint pain, and hip pain worsening over the past four days, and she secondarily reported worsening shortness of breath, dizziness, and nausea. R. 629. A physical exam revealed tenderness to palpation in her hands and knees, a chest X-ray showed a hilar adenopathy consistent with sarcoid, and an EKG was normal. R. 633. Gladys was given a Prednisone burst and a rheumatology referral and was ordered to follow up with her PCP. R. 634. When Gladys followed up with Priscila Tomlin, NP, later that month, her physical exam was normal, and she had "at least 75% improvement" in her symptoms after the Prednisone burst. R. 640–41 (noting "chronic dyspnea, chest pain, fatigue, and joint pain").

In May, Gladys saw Dr. Doss for a sarcoidosis consult. R. 714. Dr. Doss noted it was "reassuring that she ha[d] not had significant pulmonary worsening even though she ha[d] been off steroids for 1 year," but said Gladys had "a lot of arthralgias [and he] suspect[ed] sarcoidosis [was] involved with these pains." *Id.* Gladys continued to have joint issues, including stiffness in her hands for thirty minutes to an hour in the morning, she got "puffy joints, but never swelling," experienced "some severe fatigue," and "can't do several activities in one day." R. 715. She also

had "some" dyspnea on exertion "after walking 100 yards and going up stairs [made] her

winded." *Id.* Physical exam demonstrated pain with palpation in multiple fingers and in her

wrists; pain with rotation of the left shoulder; "significant" metatarsophalangeal squeeze

tenderness bilaterally; small effusion and mild warmth of the left ankle; and left handgrip limited

by pain. R. 716–17. Dr. Doss started Gladys on Prednisone with a plan to taper off, R. 714–15,

and told her to discontinue Meloxicam, R. 715. Gladys saw Dr. Doss again in September, and

her "joint pain appear[ed] to be significantly improved though not ideal." R. 731. Gladys

reported pain in her hands, shoulders, hips, and knees that was a "7/10 by end of day," said she

had "better functionality with household activities," and reported dyspnea affecting her sleep. R.

732. Physical exam revealed possible synovial thickening at the right second finger with "mild"

tenderness to palpation, and pain to palpation over the ankle with no swelling, but it was

otherwise normal. R. 732–33. Dr. Doss continued her on Prednisone. R. 731.

Gladys also visited with Britton Blough, M.D., in September for her sarcoidosis. R. 698.

She rated her pain a seven-out-of-ten and said it "require[d] prednisone plus ibuprofen multiple

times per day to be controlled," and she reported fatigue. *Id.* She denied shortness of breath at

rest, but said she experienced dyspnea on exertion, and she was "using albuterol throughout the

day and [was] not on a long acting bronchodilator." *Id.*; *see also* R. 616 ("[S]he is on Xopenex

for her asthma. She is not on a maintenance inhaler."). Physical exam showed normal results. R.

700–01. A pulmonary function test showed "mild" airway obstruction, "significant"

improvement in airway mechanics following inhalation of a bronchodilator, and normal lung

volumes and diffusing capacity. R. 701. Dr. Blough said Gladys could add Methotrexate to her

Prednisone, ordered labs for her asthma, and prescribed an inhaler. *Id.*

Gladys saw Jasmine Washington, M.D., in December, reporting "marginal" improvement in her symptoms and daily joint pain and stiffness. R. 817. She reported experiencing dyspnea on exertion despite taking Singulair and Advair for her asthma, even with walking from her house to the mailbox, and she said she experienced leg and foot swelling that developed and worsened throughout the day. R. 818. Physical exam revealed trace non-pitting edema of the bilateral extremities, tenderness in her fingers without significant edema, tenderness in her wrist with "mild" edema, bilateral posterior shoulder tenderness, left greater than right ankle tenderness with "significant" bilateral ankle edema, and decreased range of motion in the ankle joints. R. 819. Dr. Washington continued her on Prednisone and increased Methotrexate. R. 817. Gladys saw Dr. Blough later that month, reporting that Advair and Singulair had "helped significantly" with her asthma, but she had frequent palpations causing shortness of breath that made it feel like her heart was racing. Those symptoms typically resolved on their own within a few minutes. R. 803. Physical exam demonstrated some tachycardia but was otherwise normal. R. 806. Pulmonary function testing again showed "mild" airway obstruction, "significant" improvement in airway mechanics following inhalation of a bronchodilator, and normal lung volumes and diffusing capacity. *Id.* Dr. Blough assessed sarcoidosis and reactive airways disease with "moderate, persistent" asthma, deferred to rheumatology for treatment of Gladys's sarcoidosis, and continued her on Advair and Singular for asthma. R. 807.

Gladys visited with Dr. Doss in March 2018 reporting "[o]verall improvement" in her joint symptoms, but "acute worsening of joint symptoms and cardiopulmonary symptoms over the [p]ast 4-5 days" secondary to a respiratory infection. R. 980. She reported worsening shortness of breath, dyspnea on exertion and "trouble walking several miles," tightness in her chest, and fatigue, and she said her joint pain was "stable overall" and rated it a three- to four-

10

out-of-ten in severity. R 981. The joint pain was worse in cold weather. *Id.* Physical exam

showed trace edema in the lower extremities, R. 982, and Dr. Doss continued Gladys on

Methotrexate and Prednisone, R. 980.

In June, Gladys visited with Emily Clausen, M.D., for her sarcoidosis and reactive airway

disease, and she complained that her "disease control ha[d] been poor" because she had some

trouble reestablishing care at DukeHealth. R. 1219. Even so, she reported "excellent adherence

with her inhalers" and had "not been hospitalized or report[ed] any emergency room visits since

her last appointment" with Dr. Blough in December 2017. *Id.* Gladys also said she had continued

intermittent joint pain, she felt "worse overall," and had increased fatigue, joint pain, and

shortness of breath. R. 1220. Physical exam findings were normal, including "normal work of

breathing on room air." R. 1222. A pulmonary function test still demonstrated "mild" airway

obstruction, "significant" improvement in airway mechanics with inhalation of a bronchodilator,

and normal lung volumes and diffusing capacity. *Id.* Dr. Clausen did "not believe [Gladys's]

respiratory symptoms [were] due to sarcoid," and said they were more consistent with reactive

airway disease. R. 1223.

In July, Gladys presented to DukeHealth with complaints of bilateral leg swelling worse

on the right. R. 1321. She reported having swelling in her right leg and foot since 2016, but she

said it had "worsened greatly" over the past week and that the pain extended to her right hip. *Id.*

She said she had lived a "sedentary lifestyle since 2016," but had been "more active recently,"

and she denied dyspnea on exertion and "any new shortness of breath other than chronic mild

shortness of breath from sarcoidosis." *Id.* Physical exam revealed pedal and tibial edema that was

2–3+ in her right leg and 1–2+ in her left leg, "very" tender to palpation over her right calf,

edema and tenderness to palpation in both claves and feet, and pallor in her legs and feet. R.

1324–25. The physician had her transferred to the ED for suspected deep vein thrombosis and acute edema in her legs. R. 1325. A physical exam performed in the ED demonstrated that her legs were edematous up to her knees and edema of the right thigh. R. 3011. A bilateral leg ultrasound was negative for detectable deep vein thrombosis and a chest X-ray showed no evident cardiopulmonary disease. R. 3023. Gladys was discharged the following day in stable condition. R. 2998. The physician advised her to elevate her legs, avoid high-sodium foods, and "wear compression stockings if possible." R. 2529.

Gladys saw Dr. Doss a few days later. R. 1716. Gladys had taken Lasix for the past several days and her swelling had improved. *Id.* Gladys also reported pain and stiffness in her hands and feet for more than an hour in the mornings, was "[l]imping quite a bit" to accommodate pain in her right foot, and had ongoing fatigue. *Id.* She was "increasing her exercise activity and [was] now walking 1.5 miles daily." R. 1717. Physical exam revealed 1+ pitting edema to her midcalf bilaterally and tenderness to palpation in her wrists and multiple fingers. R. 1719. Dr. Doss continued her on Methotrexate and Prednisone for her sarcoidosis, and he referred her for an echocardiogram and an evaluation by cardiology for her lower extremity edema. R. 1716. Later in July, Gladys saw Robin Matthews, M.D., for edema in the setting of left ventricular dysfunction. R. 1401. Physical exam revealed 1+ edema in her lower extremities but was otherwise normal. R. 1403. Dr. Matthews assessed left ventricular dysfunction, sarcoidosis, and edema of the extremities, planned for a cardiac MRI with stress testing, and instructed Gladys to continue Lasix as needed. R. 1404. Gladys saw Dr. Matthews again in October, and Dr. Matthews noted that a repeat echocardiogram demonstrated "improvement in LV function to normal." R. 1928. Gladys "generally fe[lt] well" except for ongoing joint pain, *id.*, and physical exam findings were unchanged, R. 1930.

When Gladys saw Dr. Doss in November, she expressed frustration over her continued joint pain and stiffness, primarily in her feet, ankles, and left shoulder. R. 1749. She also expressed issues with grip and said she had recently experienced falls. *Id.* A physical exam showed warmth and tenderness in the wrists and several fingers, swelling in the fingers of her right hand, tenderness and reduced range of motion in the right shoulder with reduced abduction, "mild" warmth and pain over the anterior ankles, and hyperesthesia in the right toes. R. 1752. Dr. Doss suspected some neuropathy in her feet, prescribed Depo-Medrol, and started the process of beginning Remicade infusions. R. 1749.

In December 2018, Gladys met with Alejandro Pino, M.D., for complaints of joint pain and shortness of breath without much improvement from inhalers. . R. 3520–21. Physical exam results were normal, and Dr. Pino said it was unlikely Gladys's respiratory symptoms were from sarcoid because of her stable pulmonary function tests, R. 3524, which showed "mild airway obstruction that [was] reversible with [a] bronchodilator," R. 4603. He found the symptoms most likely resulted from reactive airways disease, and he continued her on albuterol and Advair. *Id.*

2. *Opinion Evidence of Record*

Bret Spetzler, M.D., reviewed Gladys's medical records for DDS in February 2017. R. 92–99. He opined that Gladys's pulmonary sarcoidosis and asthma caused "some shortness of breath and fatigue," but that her resulting "respiratory limitations [were] not disabling" based on her generally normal "physical exams and testing." *See* R. 94–96. More specifically, Dr. Spetzler opined that Gladys could occasionally lift/carry twenty pounds and frequently lift/carry ten pounds; could sit and stand and/or walk each for "about 6 hours in an 8-hour workday"; and should "avoid concentrated exposure" to extreme temperatures, humidity, and respiratory irritants. R. 96–97. DDS reviewer Donald Williams, M.D., affirmed these findings in May 2017.

13

*See* R. 117–20. He added that Gladys had "severe" inflammatory arthritis and should be limited to "frequent" postural activities. R. 118, 120.

In January 2019, Dr. Doss completed a "Medical Opinion Questionnaire" regarding Gladys's physical capabilities. *See* R. 2048–50. Dr. Doss opined that Gladys's sarcoidosis limited her to walking half a city block before needing to rest, sitting for more than two hours at a time and at least six hours in an eight-hour workday, standing for fifteen minutes at a time, and standing/walking for fewer than two hours total in an eight-hour workday. *Id.* He also found that Gladys needed a job that let her shift positions at will from sitting, standing, and walking, *id.*, needed unscheduled breaks for ten minutes at least once per hour, *id.*, her legs should be elevated to waist height with prolonged sitting, R. 2049, and if she had a sedentary job, she would need to elevate her legs for 50% of the workday, *id*. Dr. Doss offered that Gladys could safely lift fewer than ten pounds occasionally, could never lift ten pounds or more, and could handle 5% of the workday, finger 5% of the workday, and reach 10% of the workday. *Id.* He said Gladys should "avoid exposure" to extreme temperatures, high humidity, and respiratory irritants; and he found that she could occasionally twist, stoop, crouch, and climb stairs, and never climb ladders. R. 2050. Dr. Doss opined that Gladys's impairments would likely produce "good days" and "bad days," and would cause her to be absent from work more than twice a month. *Id.*

  3. *Gladys's Statements*

Gladys submitted a Function Report to DDS in February 2017. R. 357–64. She said that her impairments caused her to be unable to sit or stand without experiencing shortness of breath, R. 358, and that her shortness of breath made it so she could lift only ten to fifteen pounds and walk only about 100 yards before needing to rest, R. 362. In March 2019, Gladys testified at an administrative hearing before ALJ Baker. *See* R. 65–89. She described experiencing shortness of

breath and chest pain when walking and said her medications were not offering her relief. R. 72.

She stated that she had tried water aerobic therapy, but said she became short of breath in the

pool, R. 74, and reported that standing in the shower made her short of breath. R. 76. In July

2020, Gladys testified before ALJ Munday at a second administrative hearing. *See* R. 42–63. She

reported that when she experiences sarcoidosis issues, she gets "increased shortness of breath,

[and] increased pain" in her joints and would be "wiped out and [] typically in bed." R. 51.

Gladys said even simply walking to the bathroom in her home causes shortness of breath. R. 52–

53. She estimated that she could walk 100 feet before needing to sit down and reported that

sitting caused increased pain and swelling in her legs. R. 54–55. She estimated that she could lift

10 pounds. R. 54.

B.      *The ALJ's Decision*

ALJ Munday found that, prior to July 25, 2019, Gladys had relevant "severe"

impairments of sarcoidosis, polyarthritis/osteoarthritis, obesity, asthma, and left ventricular

dysfunction. R. 18. ALJ Munday summarized Gladys's testimony that her impairments caused

"shortness of breath, pain, and fatigue that is constant, but waxes and wanes;" she could perform

basic daily activities on an average day, albeit at a slower pace; she was unable to perform daily

activities when experiencing a sarcoidosis crisis; she was "in pain constantly in her joints,

including hands, wrists, shoulders, back, knees, waist, and feet;" she reported shortness of breath

walking to the bathroom; she could stand fifteen minutes before needing to sit and could walk

about 100 feet; she experienced pain and swelling while sitting down and lied down during the

day; and she did housework in stages. *Id.* The ALJ determined that Gladys's "medically

determinable impairments could reasonably be expected to cause some of [her] alleged

symptoms," but that Gladys's "statements concerning the intensity, persistence and limiting

effects of these symptoms [were] not fully supported prior to July 25, 2019, for the reasons explained" elsewhere in her decision. R. 22; *see* R. 27 (reducing Gladys's exertional RFC from "light" to "sedentary" as of July 25, 2019, and finding that, beginning on this date, Gladys's "allegations regarding her symptoms and limitations are consistent with the evidence," including treatment notes showing increasingly severe fatigue and observed dyspnea, and "ongoing swelling, tenderness, and painful range of motion in her joints").

First, ALJ Munday found that Gladys's "statements concerning the intensity, persistence, and limiting effects of her symptoms" generally were "inconsistent because the objective medical evidence support[ed] finding her capable of work at the light exertional level with a sit/stand option every 30 minutes through July 24, 2019." R. 25; *see* R. 21. Second, she considered Gladys's "complaints of shortness of breath and dyspnea on exertion due to sarcoidosis and asthma," but found that those conditions had "generally been stable with medication." R. 25. For example, Gladys's "oxygen saturation levels ha[d] remained above 95 percent," she did "not require[] home oxygen therapy," she had no emergency room visits for respiratory issues, and her "pulmonary function tests [] remained stable, revealing only mild airway obstruction significantly improved with bronchodilator, normal lung volume, and normal diffusing capacity." *Id.* (citing R. 596–600, 603–10, 701, 1110–20, 3231–34, 3263, 3381–82).

ALJ Munday then evaluated Gladys's alleged symptoms and functional limitations related to her lower extremity edema. R. 25. She discredited Gladys's testimony regarding the severity of these symptoms, noting that Gladys's "lower extremity edema was generally only minimal to mild, and one exacerbation in July 2018 resolved within four days," and "[a]lthough [Gladys] was advised at that time to elevate her legs, there [were] no other recommendations to elevate her legs in the treatment records." R. 25 (citing R. 2529). Gladys also "only had sporadic

findings of antalgic gait," but her gait was otherwise normal. *Id.*; *see* R. 26 (citing R. 2348, 2360, 2383–84, 2511). Turning to Gladys's complaints of disabling joint pain from sarcoidosis and arthritis, ALJ Munday found that "with the exception of sporadic findings, the medical evidence documents generally normal examination findings, including strength, sensation, muscle tone, range of motion, and gait with essentially no joint abnormalities. R. 25 (citing R. 2348, 2360, 2383–84, 2511). Further, Gladys "reported improvement in pain with medication, and she reported walking up to 1.5 miles a day in July 2018." R. 26 (citing R. 1717, 2478). Finally, regarding Gladys's cardiac condition, "her left ventricle dysfunction in December 2017 normalized by October 2018, and she generally denied chest pain and palpitations prior to July 25, 2019." *Id.* (citing R. 1928–31, 3164–89, 3753, 3804).

Nonetheless, ALJ Munday found Gladys's "complaints of pain in her joints and hands, and her generally minimal lower extremity edema" warranted additional limitations beyond the full range of "light" work, including a sit/stand option every thirty minutes, frequent fingering and use of foot controls, and "more restrictive" postural and environmental limitations. R. 26 (accepting DDS medical opinions that Gladys could work "at the light exertional level[] with postural and environmental limitations," but adding a sit-stand option and "more restrictive" manipulative, postural, and environmental limitations to accommodate Gladys's credibly established symptoms).

ALJ Munday then evaluated the opinion evidence of record. *See* R. 26–27. In evaluating Dr. Doss's opinion, the ALJ found that his limiting Gladys to standing fifteen minutes at a time, standing/walking less than two hours in an eight-hour workday, and lifting/carrying less than ten pounds occasionally was "not supported by the objective records or rheumatology treatment notes." R. 26. Specifically, ALJ Munday observed that "Dr. Doss's treatment notes [did] not

document motor or sensory deficits, despite [Gladys's] complaints of hand pain and stiffness, to support lifting limitations," and "the treatment records [did] not reflect lower extremity deficits, except minimal edema at times, which would limit [Gladys's] ability to stand and walk." *Id.* ALJ Munday further noted that Gladys "generally had normal gait in other treatment records," *id.* (citing R. 2348, 2360, 2383–84, 2511), and "the records [did] not reflect that Dr. Doss advised [Gladys] to elevate her legs," R. 26–27. Thus, she assigned Dr. Doss's opinion "little weight." R. 26.

C.    *Analysis*

Gladys's arguments pertain to the ALJ's evaluation of her RFC before July 25, 2019. A claimant's RFC is her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite her medical impairments and symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011), and it should reflect specific, credibly established "restrictions caused by medical impairments and their related symptoms" that affect the claimant's "capacity to do work-related physical and mental activities," SSR 96-8p, 1996 WL 374184, at *1, *2. *See Mascio v. Colvin*, 780 F.3d 632, 637–40 (4th Cir. 2015); *Reece v. Colvin*, 7:14cv428, 2016 WL 658999, at *6–7 (W.D. Va. Jan. 25, 2016), *adopted by* 2016 WL 649889 (W.D. Va. Feb. 17, 2016).

1.    *Symptoms Evaluation*

Gladys argues that the ALJ erred in evaluating her alleged symptoms. The regulations set out a two-step process for evaluating a claimant's alleged symptoms. *Lewis*, 858 F.3d at 865–66; 20 C.F.R. §§ 404.1529, 416.929. "First, the ALJ looks for objective medical evidence showing a

condition that could reasonably produce the alleged symptoms," *Lewis*, 858 F.3d at 866, "in the

amount and degree[] alleged by the claimant," *Craig*, 76 F.3d at 594. Step one is a "threshold"

inquiry, at which the "'intensity, persistence, or functionally limiting effects' of the claimant's

asserted pain" or other symptoms are not considered. *Id.* Assuming the claimant clears the first

step, the ALJ moves on to step two. There, "the ALJ must evaluate the intensity, persistence, and

limiting effects of the claimant's symptoms to determine the extent to which they limit [his or

her] ability," *Lewis*, 858 F.3d at 866, to work on a regular and continuing basis, *Mascio*, 780

F.3d 637; *Hines*, 453 F.3d at 565; *see also* SSR 16-3p, 2016 WL 1119029, at *4 (Mar. 16,

2016). "The second determination requires the ALJ to assess the credibility of [subjective]

statements about symptoms and their functional effects," *Lewis*, 858 F.3d at 866, after

considering all the relevant evidence in the record, 20 C.F.R. §§ 404.1529(c), 416.929(c). The

ALJ must give specific reasons, supported by "references to the evidence," for the weight

assigned to the claimant's statements. *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6

(W.D. Va. Oct. 21, 2013) (citing SSR 96-7p, 1996 WL 374186, at *2, *4–5 (July 2, 1996)). A

reviewing court will uphold the ALJ's credibility determination if his or her articulated rationale

is legally adequate and supported by substantial evidence in the record. *See Bishop v. Comm'r of

Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (citing *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011

(4th Cir. 1997)).

ALJ Munday's decision satisfies this deferential standard of review.

### a.    *Step One*

Gladys asserts that ALJ Munday erred at step one by finding that Gladys's medically

determinable impairments "could reasonably be expected to cause *some* of [her] alleged

symptoms," R. 22 (emphasis added); *see* Pl.'s Br. 6–7. She contends that ALJ Munday's use of

the word "some" is not a sufficient finding at step one as "*Craig* emphasized that at Step One,

'there must be shown a medically determinable impairment which could reasonably be expected

to cause not just pain, *or some pain*, or pain of *some* kind or severity, but the pain the claimant

alleges she suffers.'" Pl.'s Br. 7 (quoting *Craig*, 76 F.3d at 594) (emphasis in brief).

Alternatively, Gladys contends that even if the ALJ's use of this language alone does not

constitute error, her claim should be remanded because "the ALJ failed to say which symptoms

[Gladys's] impairments could reasonably be expected to produce in the amount and degree

alleged." *Id.* (citing *Thomas v. Saul*, No. 3:18cv700, 2019 WL 3801850, at *13 (E.D. Va. July

25, 2019), *adopted by* 2019 WL 3779515 (E.D. Va. Aug. 12, 2019)).

   This argument misses the mark. First, an ALJ's finding that a claimant's medically

determinable impairments could be reasonably expected to cause "some" of the claimant's

alleged symptoms does not necessarily render the ALJ's threshold finding deficient. *See, e.g.*,

*Arakas v. Comm'r of Soc. Sec.*, 983 F.3d 83, 96 (4th Cir. 2020) ("The ALJ concluded that

Arakas's medically determinable impairments 'could reasonably be expected to cause some of

the alleged symptoms,' thus satisfying the first step of the symptom-evaluation framework.");

*Thomas*, 2019 WL 3801850, at *13 ("[I]n finding that Plaintiff's medically determinable

impairments could reasonably be expected to produce only some of Plaintiff's 'above alleged

symptoms,' the ALJ did not reject the degree of pain about which Plaintiff complained; rather,

the ALJ merely rejected some of the symptoms alleged by Plaintiff while accepting others.");

*Phillips v. Astrue*, No. 6:10cv53, 2011 WL 2470086, at *2 (W.D. Va. June 7, 2011) ("Plaintiff

satisfied the requirements at step one, as the Law Judge found that plaintiff's medically

determinable impairments reasonably could be expected to cause some of the alleged

symptoms."), *adopted by* 2011 WL 5086851 (W.D. Va. Oct. 25, 2011).

Moreover, unlike in *Thomas*, 2019 WL 3801850, at *13, relied on by Gladys, where the ALJ wholly failed to discuss several of the claimant's impairments and alleged symptoms, here ALJ Munday engaged in a detailed analysis of each of Gladys's impairments, citing specific reasons why many of the symptoms Gladys attributed to those impairments were not credible. R. 25–26. Indeed, Gladys does not cite to any impairment or symptoms that ALJ Munday failed to discuss. As such, the ALJ's step one finding in favor of Gladys comported with the requirements of the analysis set forth by *Craig*. *See Candy A.C. v. Kijikazi*, No. 3:20cv107, 2021 WL 3627152, at *7 (E.D. Va. July 29, 2021); *Powell v. Colvin*, No. 3:16cv56, 2016 WL 6562071, at *6 (E.D. Va. Oct. 14, 2016) (finding that use of the word "some" had no harmful effect on the plaintiff, because the ALJ nonetheless found in favor of the plaintiff at step one).

> b.   Step Two

Gladys also contends that the ALJ erred at step two of the pain analysis. *See* Pl.'s Br. 12–16. Gladys specifically argues that the ALJ erred in her analysis of the severity of Gladys's shortness of breath from her pulmonary sarcoidosis and asthma, *see* Pl.'s Br. 12–15, and that she erroneously relied on findings of normal gait and strength in discrediting Gladys's symptoms with respect to her lower extremity edema and joint pain from sarcoidosis and arthritis, *id.* at 16.

In analyzing Glady's alleged shortness of breath and dyspnea on exertion, ALJ Munday found as follows:

> [T]he claimant's complaints of shortness of breath and dyspnea on exertion due to sarcoidosis and asthma have been considered, but have generally been stable with medication. Her oxygen saturation levels have remained above 95 percent, she has not required home oxygen therapy, and she has not had any emergency room visits for respiratory issues. In addition, her pulmonary function tests have remained stable, revealing only mild airway obstruction significantly improved with bronchodilator, normal lung volume, and normal diffusing capacity.

R. 25 (citing R. 596–600, 603–10, 701, 1110–20, 3231–34, 3263, 3381–82). Gladys argues that

many of the reasons relied on by ALJ Munday are either erroneous or do not provide a valid

basis for discrediting the alleged severity of Gladys's respiratory symptoms. Pl.'s Br. 13–15.

First, Gladys contends that "the fact that an impairment is stable is not a legally valid

basis to deny a claim," because "stable" only indicates that the condition is not varying, not that

it has subsided. *Id.* at 13. Gladys then argues that although the ALJ correctly found that she had

not required home oxygen therapy, the ALJ overlooked that she had been prescribed a nebulizer

for use three times a day, which Gladys says "requires a significant amount of time to use." *Id.* at

14. Additionally, according to Gladys, it was clear error for ALJ Munday to find that she had not

had any emergency room visits for respiratory issues, as Gladys went to the ER for shortness of

breath once in April 2016. *Id.* (citing R. 464, 490). Gladys also argues that although the ALJ

cited to evidence of her pulmonary function tests, her diagnosis of "*pulmonary* sarcoidosis," *id.*,

and several other exam findings—hilar lymphadenopathy, thickening of the mucosa of the right

lower lung lobe, granulomatous inflammation—"easily explain[] why [Gladys] had shortness of

breath and other symptoms severe enough to prevent her from doing light work," *id.* at 15.

Gladys faults the ALJ for not noting that she "was diagnosed as having not just sarcoidosis, but

'*pulmonary* sarcoidosis,'" *id.* at 14 (citing R. 563), but she does not develop this argument.

Relatedly, Gladys avers that ALJ Munday failed to explain, in light of this evidence, "why

shortness of breath of the severity alleged here does not exist unless there is airway obstruction,

abnormal lung volume, and abnormal diffusing capacity," and why she inferred that Gladys's

pulmonary functioning would remain normal were she to exert herself by performing "light"

work. *Id.*

Gladys is correct that her conditions being "stable" does not necessarily indicate improvement. *See Carter v. Colvin*, No. 2:14cv416, 2016 WL 491640, at *4 (N.D. Ind. Feb. 8, 2016) ("Instead of meaning that symptoms have subsided, 'stable' indicates that the condition is '[s]teady; not varying; resistant to change." (quoting *Stedman's Medical Dictionary* 1817 (28th ed. 2006))). Further, the ALJ does appear to have erred in finding that Gladys had "not had any emergency room visits for respiratory issues." R. 25; *see* R. 490 (ER visit for shortness of breath in April 2016). Nonetheless, any error in the ALJ's reliance on the "stable" nature of Gladys's condition, or her supposed lack of emergency room visits for respiratory issues,[6] in finding that Gladys's symptoms were not as severe as alleged is harmless if the remaining reasons provided by the ALJ for doing so pass muster. *See Pratt v. Kijikazi*, No. 1:20cv679, 2021 WL 4975405, at *4 n.4 (M.D.N.C. Oct. 6, 2021). I find that they do.

With respect to ALJ Munday's reliance on Gladys's not requiring home oxygen therapy, an ALJ may consider the nature of a claimant's treatment in evaluating the claimant's credibility. *Dunn v. Colvin*, 607 F. App'x 264, 273 (4th Cir. 2015) ("[I]t is appropriate for the ALJ to consider the conservative nature of a plaintiff's treatment—among other factors—in judging the credibility of the plaintiff."); *see also* 20 C.F.R. §§ 404.1529(c)(3)(v), 416.929(c)(3)(v). The logic behind that principle

> is as simple as this: if all the claimant needs is conservative treatment, it is reasonable for an ALJ to find that the alleged disability is not as bad as the claimant says that it is. Put another way, when a claimant complains that her alleged disability so bad that she is unable to work in any job whatsoever, but the ALJ finds that the treatment was not as aggressive as one would reasonably think would be employed if the alleged disability were actually that severe, then it is

---

[6] Although Gladys correctly asserts that she visited the emergency room in April 2016 for shortness of breath, she fails to explain how this error affected the ALJ's RFC finding, or how considering this isolated incident would have altered the outcome of her claim. *See Kersey v. Astrue*, 614 F. Supp. 2d 679, 696 (W.D. Va. 2009) ("Errors are harmless in social security when it is inconceivable that a different administrative conclusion would have been reached absent the error."). Indeed, this single visit to the emergency room predated Gladys's alleged onset of disability of May 1, 2016.

> reasonable for the ALJ to conclude that the conservative treatment bears on the claimant's credibility."

*Dunn*, 607 F. App'x at 274–75. In evaluating this factor, the ALJ must consider any evidence that the claimant's allegedly disabling impairment "required more aggressive treatment yet received conservative treatment for other reasons" unrelated to the severity of the impairment or that the claimant had a "good reason" for not following prescribed treatment. *See id.*

Gladys does not specifically fault the ALJ for relying on her lack of home-oxygen therapy as one reason to discount her allegedly disability respiratory symptoms. Rather, she faults the ALJ for overlooking the fact that she had a prescription for a nebulizer to use at home three times a day. *See* Pl.'s Br. 13–14. ALJ Munday did not mention Gladys's nebulizer, but "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in [her] decision." *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014). Moreover, while Gladys points to several cases wherein and ALJ's failure to consider a claimant's nebulizer use was held to be error, Pl.'s Br. 5 n.13, in those cases, the claimant had testified that he or she used a nebulizer and that it caused some degree of functional limitation. *See, e.g.*, *Konoloff v. Comm'r Soc. Sec.*, No. 1:14cv338, 2016 WL 1237884, at *9 (N.D. Ind. Mar. 30, 2016) (claimant testified he used nebulizer treatment three times during ordinary working hours and said his first treatment made him "sluggish"); *Klitz v. Barnhart*, 180 F. App'x 808, 809 (10th Cir. 2006) (claimant testified that she used nebulizer two times per day for two to three days a week and that each use took fifteen to twenty minutes).

Here, Gladys did not testify, and no other evidence shows, that she used her nebulizer during work hours or even on a regular basis. Indeed, the only evidence Gladys cites demonstrating her alleged nebulizer use is a few instances where it was noted that she had an active prescription for it. *See* Pl.'s Br. 5 (citing R. 349, 459, 530, 552, 556, 474, 593, 603, 717,

2060). And, even if Gladys's having listed her nebulizer as a medication she took in her Disability Report, R. 349, can be said to demonstrate actual use of the nebulizer, that report provides no information as to how often or when she used it, how long each use took, or any work-related functional limitations accompanying such use. This evidence simply falls short of demonstrating any *actual* "limitations or restrictions imposed by the mechanics of treatment" from Gladys's nebulizer that the ALJ failed to consider. *See* Pl.'s Br. 14 (quoting SSR 96-8p). As such, I cannot find that the ALJ erred by relying on Gladys's lack of home oxygen therapy to discredit the alleged severity of her symptoms without mentioning her nebulizer prescription. *Cf. Stephens v. Colvin*, No. 6:15cv44, 2017 WL 773741, at *4 (W.D. Va. Jan. 30, 2017) ("Medical diagnoses without any accompanying functional limitations do not support a finding that a particular medical issue is disabling."); *Timmons v. Colvin*, No. 3:12cv609, 2013 WL 4775131, at *8–9 (W.D.N.C. Sept. 5, 2013) (finding no error in ALJ's failure to consider the fact that claimant had a "prescription for a cane" where "neither the prescription nor other evidence show[ed] how [claimant] actually use[d] the cane").

ALJ Munday also reasonably relied on the evidence demonstrating stable pulmonary function tests "revealing only mild airway obstruction significantly improved with a bronchodilator, normal lung volume, and normal diffusing capacity" to discredit the alleged severity of Gladys's dyspnea. R. 25 (citing R. 596–600, 603–10, 701, 1110–20, 3231–34, 3263, 3381–82); *see also* R. 701, 806, 1222. Gladys cites to other evidence that she claims "easily explains" why her shortness of breath and other symptoms preclude her from doing "light work." Pl.'s Br. 15 (citing R. 477, 525, 563). She does not assert that the ALJ failed to consider this evidence, but rather appears to ask the Court to reweigh the same evidence considered by the ALJ and reach a different conclusion. It is the "province of the ALJ," however, to make

credibility determinations, *Clemins v. Astrue*, No. 5:13cv47, 2014 WL 4093424, at *21 (W.D. Va. Aug. 18, 2014) (quoting *Ratliff v. Barnhart*, 580 F. Supp. 2d 504, 517 (W.D. Va. 2006)), and "[s]o long as the ALJ has followed the regulations, the reviewing court must defer to the ALJ's determination if it is reasonable," *id.* Here, the ALJ considered the evidence of Gladys's pulmonary sarcoidosis, R. 22–25, extensively discussed the objective and other evidence bearing on Gladys's allegations of shortness of breath, *id.*, and reasonably determined that the minimal findings on pulmonary function tests, among other reasons, demonstrated that Gladys's respiratory symptoms were not as severe or functionally limiting as alleged, R. 25. As such, I must defer to ALJ Munday's conclusion.

Moreover, contrary to Gladys's contentions, the ALJ did not find that "shortness of breath of the severity alleged [by Gladys] does not exist unless there is airway obstruction, abnormal lung volume, and abnormal diffusing capacity." Pl.'s Br. 15. Rather, she found that the absence of those findings was one of many factors indicating that Gladys's symptoms were not as severe as alleged. Likewise, the ALJ did not "infer[] that [Gladys's] pulmonary functioning, which apparently was not tested during exertion, would remain normal if she were to exert herself by performing light work." *Id.* Instead, she found that Gladys's normal pulmonary function was one of several pieces of evidence indicating that, although Gladys suffered from shortness of breath and dyspnea on exertion, those symptoms were not as severe as Gladys alleged before July 25, 2019. *See generally* R. 21–28. Moreover, Gladys did "not have to be [symptom]-free in order to be found not disabled," especially where, as here, the ALJ found she was only capable of "performing work at a lower exertional level than she did before her alleged onset date." *Green v. Astrue*, No. 3:10cv764, 2011 WL 5593148, at *4 (E.D. Va. Oct. 11, 2011), *adopted by* 2011 WL 5599421 (E.D. Va. Nov. 17, 2011); *see also Andreolli v. Comm'r of Soc.*

*Sec.*, No. 07-1632, 2008 WL 5210682, at *4 (W.D. Pa. Dec. 11, 2008) ("[I]t is well settled that a claimant need not be pain-free or experiencing no discomfort in order to be found not disabled."); *Fisher v. Comm'r of Soc. Sec.*, No. 6:11cv26, 2013 WL 1192576, at *4 (W.D. Va. Mar. 22, 2013) ("[T]hat a person cannot work without some pain does not satisfy the test for disability.").

Gladys also asserts that, in discrediting the alleged severity of her lower extremity edema and joint pain, the ALJ erroneously relied on findings of normal gait and strength. Pl.'s Br. 16. The first problem with this argument is that, in addition to citing Gladys's generally normal gait and strength, ALJ Munday provided several other reasons—including her reported "improvement in pain with medication" and "walking up to 1.5 miles a day in July 2018," R. 26—which Gladys does not contest, for discrediting the alleged severity of these symptoms. *See Pratt*, 2021 WL 4975405, at *4 n.4 ("[A]ny error is harmless given all the other reasons the ALJ provided."). Even so, the ALJ's reliance on these findings was reasonable. Gladys claimed that she could not stand for more than fifteen minutes without needing to sit, and she said she could lift only ten pounds. Consistent findings of normal gait and strength, although not conclusive, tend to reflect an ability to stand/walk (normal gait) and to lift (normal strength) that would exceed these allegations. *See, e.g.*, R. 96, 119 (DDS physicians' medical opinions that Gladys's generally normal physical exams supported limiting her to lifting/carrying up to 20 pounds and standing/walking for about six hours in an eight-hour workday). Indeed, ALJ Munday credited the DDS physicians' medical opinions to that effect, R. 26, and Gladys does not challenge her determination. Thus, the ALJ could reasonably rely on Gladys's generally normal gait and normal strength as one reason among several to discredit the alleged severity of her lower extremity edema and joint pain. *Cf. Dinges v. Colvin*, No. 5:14cv32, 2015 WL 3467024, at *11

(W.D. Va. June 2, 2015) ("The standing and walking restrictions also have little support. Physical exams routinely showed full strength in the lower extremities and normal gait.").

In sum, the ALJ reasonably discredited the alleged severity of Gladys's shortness of breath based upon Gladys's oxygen saturation levels,[7] lack of home oxygen therapy, and the minimal findings on pulmonary function testing. Because these are valid reasons supporting her credibility determination, any errors in ALJ Munday's reliance on Gladys's symptoms being "stable" with medication, or a lack of ER visits, are harmless. Lastly, it was reasonable for the ALJ to consider Gladys's generally normal gait and normal strength as one of several factors in assessing her allegations regarding the severity of her lower extremity edema and joint pain.

2.    *Dr. Doss's Opinion*

Gladys also contests the ALJ's evaluation of the opinion of her treating rheumatologist, Dr. Doss. Pl.'s Br. 8–12. For claims filed before March 27, 2017, an ALJ is required to give the opinion of a treating source controlling weight, if she finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The ALJ must give good reasons for not affording controlling weight to a treating physician's opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Saul v. Astrue*, No. 2:09cv1008, 2011 WL 1229781 (S.D. W. Va. Mar. 28, 2011). Further, if the ALJ determines that a treating physician's medical opinion is not deserving of controlling weight, the following factors must be considered to determine the appropriate weight to which the opinion is entitled: (1) the length of treatment and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the opinion's support by medical evidence; (4) the opinion's consistency with the record as a whole; and (5) the treating physician's specialization. 20 C.F.R. §§ 404.1527(c)(2)–(5), 416.927(c)(2)–

---

[7] Gladys raises no argument contesting the ALJ's reliance on her oxygen saturation levels.

(5).  If an ALJ does not give the treating physician's opinion controlling weight, the ALJ is

required to give specific reasons for the weight given to the treating physician's medical opinion

and those reasons must be supported by the record. *See generally Dowling v. Comm'r of Soc.

Sec. Admin.*, 986 F.3d 377, 386–86 (4th Cir. 2021). Nonetheless, the fact "[t]hat the ALJ did not

spell out every fathomable consideration is not reversible error." *Smith v. Astrue*, 2:11cv32, 2012

WL 1435661, at *6 (N.D. W. Va. Apr. 24, 2012) (citing *Bledsoe v. Barnhart*, 165 Fed. App'x

408, 411 (6th Cir. 2006)). Moreover, there is no requirement in the regulations that the ALJ

include a lengthy or precise analysis in the opinion. *Richards v. Astrue*, 6:11cv17, 2012 WL

5465499, at *6 (W.D. Va. July 5, 2012) (internal citations omitted).

ALJ Munday considered Dr. Doss's opinion that Gladys could stand fifteen minutes at a

time and stand/walk fewer than two hours total in an eight-hour workday, lift and carry fewer

than ten pounds occasionally, handle and finger only five percent of the workday, and reach only

ten percent of the workday; needed to elevate her legs half of the workday and needed

unscheduled breaks once per hour; would be absent from work more than twice per month; could

not tolerate any exposure to extreme temperatures, weather, and respiratory irritants; could never

climb ladders; and could occasionally twist, stoop, crouch, and climb stairs. R. 26; *see also* R.

2048–50. ALJ Munday assigned Dr. Doss's opinion "little weight." R. 26. She reasoned that "the

limitations to standing, walking, lifting, and carrying are not supported by the objective records

or rheumatology notes." Specifically, "Dr. Doss's treatment notes [did] not document motor or

sensory deficits, despite [Gladys's] subjective complaints of hand pain and stiffness, to support

lifting limitations," "the treatment records [did] not reflect lower extremity deficits, except

minimal edema at times, which would limit [Gladys's] ability to stand and walk," and Gladys

"generally had normal gait in other treatment records." *Id.* (citing R. 2348, 2360, 2383–84,

2511). ALJ Munday further found that "the records do not reflect that Dr. Doss advised [Gladys] to elevate her legs." *Id.* ALJ Munday found that a thirty-minute sit/stand option would address Gladys's complaints of occasional edema. *Id.*

Gladys first contends that ALJ Munday's conclusion that Dr. Doss's findings regarding Gladys's limitations in standing, walking, and lifting were "not supported by the objective records or rheumatology treatment notes," R. 26, is "purely conclusory" because the ALJ did not identify any evidence inconsistent with these findings. Pl.'s Br. 8. This argument relies on too narrow a reading of ALJ Munday's analysis of Dr. Doss's opinion. The sentences that follow this finding by the ALJ clearly lay out the evidence upon which it was based. Namely, the ALJ concluded that Dr. Doss's findings regarding Gladys's lifting limitations were inconsistent with the absence of motor or sensory deficits in his own treatment notes and that Dr. Doss's findings on Gladys's ability to stand and walk were contradicted by a lack of lower extremity deficits, aside from "minimal" edema at times, in the treatment records. *See* R. 26 (citing R. 2348, 2360, 2383–84, 2511). As such, the ALJ specified which evidence Dr. Doss's findings were inconsistent with—namely, his own treatment notes. *Cf. Sharp v. Colvin*, 660 F. App'x 251, 257 (4th Cir. 2016) (explaining that the ALJ did not err in discounting the treating physician's opinion for being inconsistent with his own treatment notes because "[w]hile the ALJ did not cite specific pages in the record, his explanation relied on and identified a particular category of evidence"). Moreover, the ALJ also relied on other records demonstrating generally normal gait on exam, which she cited. *See, e.g.*, R. 2348, 2360, 2384.

Gladys also asserts that the ALJ's finding that the record does not reflect lower extremity deficits that would limit her ability to stand and walk is clearly erroneous. Pl.'s Br. 9.[8] She

---

[8] Gladys further argues that the ALJ erred by "demanding" objective evidence of her pain to support Dr. Doss's opinion. Pl.'s Br. 9. The Court is unaware of, and Gladys does not cite to, any case holding that an

contends that although the ALJ said she only showed "minimal" edema at times, R. 26, the record contains several instances where her edema was not described as "mild" and that other evidence demonstrates impairments in her ability to walk beyond what the ALJ found. Pl.'s Br. 9–10.

First, while Gladys relies on evidence appearing in other records, it can reasonably be inferred that ALJ Munday was referring to a lack of such findings, not in the entirety of the record, but rather in Dr. Doss's own treatment records. And, as noted above, inconsistencies between a treating physician's own treatment notes and his or her opinion are a valid basis for discrediting that opinion. *See Sharp*, 660 F. App'x at 257.

Regardless, in her narrative discussion, the ALJ explicitly considered much the evidence Gladys claims was overlooked. *See* R. 24 (noting findings of "ankle tenderness with significant edema and decreased range of motion" in December 2017 and "pedal and tibial edema 2 to 3+ in her right leg and 1 to 2+ in the left leg" in July 2018); R. 25 (noting hyperesthesia of the right toes in November 2018). Nonetheless, she also noted conflicting findings showing no edema, or only minimal edema. *See* R. 23 (noting "no lower extremity edema" on exam in March 2017, no edema in May 2017); R. 24 (noting "no lower extremity edema" in February 2018, trace edema in the lower extremities in March 2018, "no lower extremity edema" in May 2018, and minimal lower extremity edema in July 2018 after a flare up). R. 25 (noting "1+ lower extremity edema"

---

ALJ cannot discredit a physician's opinion based on its inconsistency with the objective evidence of record. Indeed, the regulations make clear that comparing a medical opinion with the objective evidence is a key, and necessary, component of the ALJ's evaluation of such opinions. 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, *particularly medical signs and laboratory findings*, the more weight we will give that medical opinion." (emphasis added)). As such, I cannot find that the ALJ erred by assigning Dr. Doss's opinion "little weight" based on its inconsistency with the objective evidence. *See Bishop v.*, 583 F. App'x at 67) (substantial evidence supported ALJ's decision to reject treating physician's opinion "in its entirety" where the opinion was "inconsistent with the mild to moderate diagnostic findings . . . and the generally normal findings during physical examinations").

in October 2018 and trace edema in January 2019). Taking the ALJ's opinion as a whole, it is clear she considered the evidence cited by Gladys and reasonably determined that Gladys's "generally minimal lower extremity edema," R. 26, nonetheless only warranted restricting Gladys to "light" work with a sit/stand option every thirty minutes, but did not support the far more restrictive limitations offered in Dr. Doss's opinion. *See Thompson v. Colvin*, No. 7:13cv32, 2014 WL 4792956, at *3 (W.D. Va. Sept. 25, 2014) ("Taking the ALJ's opinion as a whole, it is clear that he considered the evidence of record and provided sufficient support for his decision."). Thus, I find no error in ALJ Munday's assigning "little wight" to Dr. Doss's extremely limiting opinion.

Lastly, Gladys contends that ALJ Munday erred by relying on her "generally . . . normal gait" as a basis for discrediting Dr. Doss's findings. Pl.'s Br. 11–12. For the reasons discussed above, however, a claimant's normal gait is reflective of the claimant's ability to stand and walk, at least to some degree. *See Patricia M. v. Comm'r of Soc. Sec.*, No. 4:18cv60, 2020 WL 2107081, at *8 (W.D. Va. Apr. 1, 2020) (finding ALJ satisfied treating physician rule where she explained that opinion was inconsistent with physician's own finding, including that claimant "almost always walked with a normal gait"), *adopted by* 2020 WL 2105015 (W.D. Va. May 1, 2020). And, an ALJ may reasonably discredit a treating physician's opinion based on its inconsistencies with the objective medical evidence of record. As such, I find no error in the ALJ relying on findings that Gladys had a normal gait as one reason for concluding that the limitations identified by Dr. Doss were not supported by the record.

### IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **DENY** Gladys's Motion for Summary Judgment, ECF No. 15, **GRANT** the Commissioner's

Motion for Summary Judgment, ECF No. 17, **AFFIRM** the Commissioner's final decision, and

**DISMISS** this case from the Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations

within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is

directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to the parties.

ENTER: August 24, 2022

Joel C. Hoppe
U.S. Magistrate Judge